Case number 417-0220, the people of the State of Illinois v. James Chatham. For the appellant, we have Ms. Pugh. And for the appellee, we have Mr. Manchin. You may proceed, counsel. Good morning, Your Honor. My name is Deborah Pugh, and I work for the Office of the State Court of Appeal, and I represent the count of James Chatham. The Assistant State's Attorney at trial in this case could not have been clearer. The Assistant State's Attorney alerted defense counsel, I think you're being ineffective. She said, I'm very concerned about an ineffective assistance of counsel claim if you go forward without the gunshot-resolute testing that you requested. I apologize, counsel. I'm having a little trouble hearing you. Oh, sure. Is this on? That's a recording, not an amplified. I'll try to amplify myself. Would you please? Thank you. I'll start from the beginning. Okay, I'll skip it this morning. The Assistant State's Attorney said what? She said, so in this case, the State's Attorney said, she sent an email that she included in the record to defense counsel, and she said in the email, I'm very concerned about an ineffective assistance of counsel claim if you go forward for trial without the gunshot-resolute testing that you requested. She said, the gunshot-resolute testing will be ready by October 31st for sure, and we can go to trial then. But counsel said, no, we have to go to trial soon. He insisted on going to trial just one month earlier. The trial started on September 26th, and all the testing could have been completed by October 31st. But counsel did not want to go to trial at that late because he was going to be on vacation that late because he was about to make a run for State's Attorney in Macon County. Now when you say make a run, he was already in the run. The run was over. No, the election was going to take place during the time that he said he wanted to be off, correct? No, he announced his candidacy I think in June of 2016. But counsel, my question is this. You talk about defense counsel making a decision to go forward without the testing. What role did your client play in this? Was he advised? What was his position on this? His position on this, though, he waived a lot of conflicts on the record. He explicitly waived the conflict that counsel was friends with the decedent's father. He explicitly waived the conflict that he's running for State's Attorney, which could obviously be problematic. But one thing he never said, he never said that I definitely do want to go to trial when he always said I would like to have this testing done. He said he was eager to go to trial because he was concerned about what his counsel was telling him about the timing. But he always said he wished that he wanted to have that testing. But it's also important to remember that under Campbell, the decision to ask for continuances to do any investigation into the case belongs to counsel and counsel alone. In fact, when defense counsel said to the Assistant State Attorney, well, I understand all the testing will be ready, but my client wants to go to trial sooner than that. She said, the thing is, he doesn't have a right to do this. He cannot object to a continuance. This is all on you. You're the one who went to law school. You're the one who's representing him. This is not a pro se defendant who is making a bad decision and now is complaining about it on appeal. So you're saying it was ineffective for counsel to acquiesce to what his client wanted? Well, the client, though, whatever the client wanted, the client wanted to have a fair trial. The client continued, and counsel continued to argue the same theory of the case, which is that it was a reasonable self-defense based on the decision to shoot him first. And without any corroborating evidence, that's a very tough protocol. You didn't answer just the sold-awards question. Oh, well, what I mean is the counsel, he did have counsel. The defendant was very unclear on the record. What you have here is an uneducated man. Well, he said, he said... Well, let me ask you this. Isn't it correct that the defendant basically, the way I read the record, is he wanted to go to trial before the election so that he didn't run the risk of Mr. Hassinger no longer being able to represent him because he was state's attorney? Well, I think that that was definitely part of his concerns. He was concerned about his timing. And when they talked about not having the testing, he spoke of, which was a little odd, but he talked about mentioning it to the jury, which, of course, this didn't end up being a jury trial, mentioning it to the jury as to why it wasn't there. But I have to disagree with your representation that he wasn't clear on the record that he wanted to go forward in the absence of these results. Well, I understand what you're saying. What I meant was that he was always saying that he did actually want to have them. He was conflicted between wanting to go to trial and wanting the results. And he definitely did want to go to trial. He was concerned about counsel not being able to represent him anymore. But this issue of counsel's timing really shouldn't have been the defendant's problem. He was concerned that if I don't go to trial without this evidence, then things would be even worse for me down the road. And this is not a position that a defendant should be facing, having to make these sort of defensive calculations trying to figure out how can I make sure that my 6th Amendment rights are protected. If I go to trial without this, then I have this problem because I'm going to trial without this evidence. But then if I wait, then I might have other problems down the road. And this is a Hobson's choice that the defendant had to make. And also, he was very concerned about timing. But by this point, all the discovery had been done. He was very concerned about the timing. But it's not so clear that a new attorney couldn't have come in and gone to trial fairly quickly because by October, all of the discovery would have been done. What if he didn't want a new lawyer? I mean, maybe he didn't. I mean, as it turned out, he could have kept this lawyer the whole time. He could have waited until after the election. But at the same time, he knew that no matter what, that there was a risk that he could have a different lawyer for after a motion for a new trial and all these things. But he never said anything like, I want this lawyer who's so great. I definitely want this lawyer who's focused on the time. And so here, and again, this was a decision that belonged to counsel and not to the defendant. And that gets me back to my question. So is he automatically ineffective because he went along with what his client wanted him to do? Well, it's not so much. I think the idea isn't so much that he went along with what his client would do. The client wasn't setting a time. Well, let's assume, humor me, that he went along with what his client wanted to do. Is that automatically ineffective? Well, it's not automatically ineffective. But in a case like this, where that's what the entire theory of the case is based on, there's a reason that some decisions that belong to the lawyer alone, lawyers as officers in the courts, are required to put on the best defense possible. And so if you have an uneducated, possibly mentally ill client who's asking you to do a lot of wacky things, that is not something that one should be doing. This is something that comes up for defense attorneys all the time, where you have a client who's asking you to do something that you defer to your own judgment as a lawyer and as an officer of the court. And so... One of the questions I had, and I suppose it can't be... it's not developed at this point, is, was counsel acquiescing to what his client wanted, or was the client acquiescing to what the lawyer wanted? Well, I think given that the timing was completely based on what counsel needs, counsel needed to take that time off before the election. Was that ever explained? It is explained. How is it explained? It was in a July 8th email, which... No, no, I mean... I can... The presumption is you've been in a campaign, you want to take the time off just before the election. Was it to actually take his family somewhere and go someplace, or was it to do more campaigning? And how did he explain that to his client? Well, on the record, he talks about the judges saying, okay, so the election is November 8th, or whatever it was, in 2016, and so the focus for the time was definitely on the election. And then in the email to the state's attorney, and also in his hearing, he was saying he wanted to take that leave off at the end of October. He didn't explicitly say before campaigning versus vacation, but the implication was there. But Trulia, though, even if you wanted to go on America's Got Talent, whatever he's doing in order to highlight his own needs versus the needs of his defendants, the issue would be the same, even if he weren't going to be in the polls. Because the focus is on... He said that this evidence was essential to the case. He said that this evidence was potentially exculpatory. And then he was warned by the state's attorney that he could be considered ineffective, but he still went to trial without it. And he recognized this problem pretty early on in the trial, but when the Illinois State Police scientist was testifying, Hauser called her sidebar and was saying, wait a minute, this is violating my client's rights going to trial without this evidence. But he said it was the state's fault for not having the evidence tested sooner. And the state was saying, well, we actually wanted to wait until October when all this evidence would be done. Hauser made the same argument at the close of evidence before closing arguments, where he was saying, the state is violating my attorney's right to put on a defense, his right to a fair trial, by going to trial without this evidence. And again, the state is saying, this is not what happened, it was you, your decision. And he makes the same argument in promotion for new trials. He recognizes the problem, but he places his land elsewhere under the state. Counsel, let me ask you about... I'm still not ready to leave the issue of the client acquiescing and basically being the driver behind this. Back in June of 2016, when Mr. Hassinger announced he was in court and they talked about his announcement and what that might mean, and he specifically talks about the fact that his client is asking him to withdraw his request for that testing due to him making that announcement. And then afterwards, the defendant files pro se, even though he was represented by counsel at the time, he files a motion, and he specifically says, I've talked to my lawyer about this, and he told me I can't have my trial until this testing, my motions are heard, this testing and all that. And he says he wants to grant his request and give him a trial date. He wants the court to grant his request and give him a trial date. Basically, I don't want to be bothered with seeking this testing. I want a trial date. I mean, to be fair, that chicken butter was stricken from the record because he's not a pro se defendant, because he should be a lawyer. Right, but that does reflect, I think, his thought process and where he stood on the matter. Oh, this is not a clear-cut case where he was saying, my lawyer's doing the wrong thing, my lawyer's doing the wrong thing. It's far from that. But he was conflicted, though, because at the same time, he was always saying, I do want that testing, I do want that testing, but he's saying, I want that testing on my lawyer's schedule. And the focus the entire time is, what does Mr. Hastings need? It's not, what does Mr. Chapman need? It's focusing on what schedule versus the lawyer asking for it. Well, I guess, in my view, the pro se note, whatever that motion that was filed before the court, suggests that your client said, I don't want this. Not that he said, because my lawyer won't ask for it, or my lawyer won't be available. He's just saying, I want to go forward. I don't want this. But that was based on what Hastings had told him. This is based on what he was told by his lawyer. His lawyer told him, you have to wait. According to his own words. Or his lawyer told him, either you might have to wait, who knows what will happen in the future. Well, is anything like that in the correspondence from the defendant? No, that's not in the correspondence from the defendant. The implication is that, if he doesn't go to trial, then there will be an unknown happening once Mr. Hastings goes on vacation. Was there ever any conversation about November? Well, no. The conversation was about October. What I mean is that he's already waived the conflict. Did anybody say anything about we can try this on November 12th? There was no discussion about that. I think Mr. Hastings was probably assuming, certainly hoping that he would win. Well, so what if he wins? You don't take office immediately. Yeah, he doesn't take office until sometime in December. But then I think more questions would be raised about a conflict if the actual state attorney in the county... But his client has already... We waived the candidacy. We waived the candidacy. Ask him again. Do you care? And ask trial counsel. That could have happened. The trial judge might say, I'm not going to let you withdraw. Right, that's possible. It's absolutely possible. That's not what happened at all in the record. There's just nothing indicating it. But Mr. Hastings sort of having... One of the problems is everything that we're talking about, at least from my perspective, it's hard to develop it on direct appeal. This is an issue. This is definitely an issue with this case. This is something that I struggle with regularly. Not only about the conversations that were happening between Mr. Chatton and Mr. Hastings, but also what the results of the gunshot residue testing would be. And so there is some concern, absolutely. There's some concern about what would be best. We're asking for a new trial. Because if the gunshot residue testing had come back positive, then there would have been a very different idea about what the evidence in the case was. What about the bags? The bags on the hand. This is another question about what happened with the bags on the hand. Because the assistant state's attorney represented to Mr. Hastings that the Omo State Police lab had said these are the items that are most likely to contain the gunshot residue. And the forensic pathologist said we put the bags on the hand to collect just that kind of evidence. And when the Omo State Police forensic scientist was testifying, he was saying the rags collect the GSR. He was saying we didn't test them. But then he said we don't have a policy of not testing it. And Mr. Hastings didn't follow up on that, why he was giving this conflicting information about why. Maybe the state should have followed up on that, too. I thought we asked you to test them. Right, no, it's very unclear because they clearly represented, the Illinois lab clearly represented the assistant state's attorney, that that was a very promising item. At least that's what she indicated to Mr. Hastings. Exactly, exactly. And the forensic pathologist was also saying that's the very reason we put the bags on the hand. So there was a real question there, too, about why these weren't tested. And this is another element of the ineffectiveness of the counsel, of why counsel didn't pursue this more and try to figure out what is happening. He had gotten a continuance and tried to figure out why am I getting this conflicting information from the Omo State Police lab. So he should have asked for a continuance, you're talking about in the trial, while they were in trial? He found out on September 1st that the bags weren't tested. And the trial didn't start until September 26th. So he had this period of time to sort of get to the bottom of this. And there was no cross-examination about this. So there are a lot of questions, there are a lot of unanswered questions in this case about what the best relief would be because of the onerous, because of the mysteries. And so I'm asking for a new trial, but recognizing that there are so many concerns about it. The other possibilities that I was thinking about were to even come to an agreement, which I know this court, the middle court, really wants to be doing this. I didn't include it in my brief because I didn't know this case, but in the Alonzo O, where this court had remanded the juvenile case to develop the record further. But there's no post-conviction proceedings in juvenile proceedings. So why should we address this at all as opposed to simply permitting the defendant to proceed on a post-conviction petition with the wishes? That would be my alternate request for relief because I do recognize the problems with the record and that there is a lot that could be developed. And so my concern is that if this court does feel that the record is not sufficiently developed, that this court would indicate so in their decision so that it could not be considered versus being caught up should it be filed a post-conviction petition raising the same issues. And so this court would recognize that these issues might be better developed in an evidentiary hearing in the post-conviction court because we have the issues of what the conversations were between the defendant and the jury, what the HGSR evidence would have shown, and to be honest, whether going in blind without knowing what the GSR evidence was, counsel didn't know whether if he had gotten negative GSR, he might have pivoted to an unreasonable self-defense, which he didn't do here, because he was just going in blind. I don't know what the evidence would have shown. We have possible fiscal evidence that could show that the decision could be shot first. We don't have it, so I'm just making up this theory based on the assumption that it would have shown. But it doesn't necessarily show that he shot first, if it exists. I mean, it shows there's a... Oh, no. No, certainly not. It's merely another element in the defense. This is a drug house with almost everyone who testified wasn't intoxicated at the time of the offense, except for possibly Chetan's brother, who testified that there was shooting coming from the bedroom. And there's just a lot of... It's pretty jumbled in terms of what people said to the detectives originally, what they said at trial. Jimmy Magon was saying originally to the detectives that there was shooting coming from the bedroom at trial. He changed his story. It's just... There's a lot. There are a lot of questions regarding the evidence, which is why the physical evidence wouldn't have been so essential to the case in terms of reorienting the way the evidence is seen. If we have evidence that Nate Johnson, a drug dealer who was known to always carry a gun, had GSR on his hand, that would provide a lot more corroboration for Mr. Chetan's testimony. And so for all of these reasons, we ask that this court has no further questions. We ask that this court re-manifold in trial or in the alternative look to one of the other possible remedies, for instance, saying that each idea that the evidence, that the record's not developed enough on direct appeal and needs to be lettered off to the Supreme Court. Thank you, counsel. Mr. Manchin. Nate, please, before counsel. This court very well could just bump this down the line to a post-conviction petition on the basis that the record's not clear enough. But I think this record is clear enough to show that there is no ineffective assistance of counsel. This Finnick's whole claim is that Mr. Hassinger was so concerned about the upcoming election that he abandoned the defendants. That claim is completely contrary to this record. He states in open court, the defendant asks me to withdraw this request for testing because he doesn't want to have to wait for the results. He wants a trial as soon as possible. I don't disagree with that. But that is earlier in the process. And the defendant keeps saying, well, yeah, I'd like those results, and maybe we'll get them. And if we don't get them, then we're going to try to talk about them. You know, like, he's got this aspirational hope that a bolt of lightning will strike and the lab will get it done early. My concern is, not that he abandoned him because of the election, but that the record doesn't tell us anything about, I could do the trial on November 12th. I could do the trial on October 10th. I could get my client to say explicitly in front of the judge, I realize I have a choice. This is the choice I'm making. There are inferences to be drawn from the record. Yeah, defendant is apparently giving up. Is he giving up or is he equivocal? Well, the defendant on the record states, on the record, in court, says, I want trial as soon as possible. I want it now. If the results come in before the trial is set, fine. If they're not in, fine. I want it now. I want a trial now. I don't want to wait any longer for the results. There can be no indication that this is a situation where counsel is accepting to what the client has told him to do. Yes, it's the attorney's decision whether or not to ask for details. But I submit that it's not ineffective to say, with the client saying, I don't want to wait. Where it's already been this long of a wait to say, okay, we'll go ahead and I'll go ahead and follow your request. Especially in this situation, it is not ineffective assistance of counsel to say, okay, I don't want to ask the lab to do those test results. The chances are that these results are going to be very detrimental to my defendant or are not going to show anything at all. It's better than just hanging out there saying it was never tested. The state has not done its job of investigating this case properly. Was that argument made? He tried to make it, yes. So you're suggesting this may have very well been strategy on defense counsel's part to say it's better to not have the results than to have results confirming that he didn't fire the weapon. I'm just saying that the claim that that would be a reasonable strategy to say that the decision to go to trial before the election and to go without the test results does not in any way, shape, or form fall below a reasonable standard of care on the part of a reasonable standard of defense representation. I don't understand the answer you gave to me. He tried to make that argument. He made it or he didn't. What happened? He argued to the court that the state, that sanctions should be imposed upon the state for not having done the testing sooner and he argues in the court that the investigation done by the state was inadequate and that supported the defense's claim that shots were fired from inside the rooms. So he did make the argument regarding lack of investigation on the part of the state. What does the record show how the state responded to the argument that it was its burden to check out the gunshot residue and if there's no evidence it should be held against the state as it's a failure to meet its burden of proof? The state's response was, hey, we didn't test it earlier. You requested it but then decided not to get it done. There should be no sanctions here where the defendant has requested the tests and then decided legal oversaws. Well, it's not a question of sanctions. It's a question of the state's burden of proof and the argument of it. So it's kind of like the missing witness in the structure. This evidence could have been available. The state has this burden of proving beyond a reasonable doubt. The state failed to pursue it and therefore a judge should try our fact. You should draw an inference against the state and accept the fact that this evidence might have been beneficial and we don't know. Was that argument the one made? If so, how was it responded to? I honestly don't recall. I recall that the defendant made the argument for sanctions and the state said that it was under no obligation. Before the defendant requested the testing, there was no obligation on the part of the state to have done the testing as part of its interim investigation. Following up on Justice Sotomayor's question and the idea of this being a possible strategic call, it would be easier to view it as a strategic call had the defense made the argument, which you're familiar with, we all are, and those of us who are involved in criminal cases, that if there's a question out there that could have been addressed and the state was a burden to, you know, no one tested the fingerprints on this or no one tested the gunshot residue or DNA tests, they could have and should have and the inferences should be held against the state for its failure. Apparently that argument wasn't made? It was made. The trial court shut it off saying, okay, we're not going to impose any sanctions or anything. We're not testing this because of this whole scenario of you could have waited for the test but decided not to. What about the bags? I don't understand when... I didn't understand either. The evidence there really can't be any more negative than the sweatshirt or the jacket or whatever, right? Whatever did get tested. What got tested? The sweatshirt? A pullover? Something got tested. They were doing something. They said they could test other items but not others. But they didn't say they couldn't test the bags. They just said later, it's our policy not to. Well, whatever the bags show, then the forensic expert could say, but we can't state with a certainty that this meant he fired because there was gunshot residue in the air. There may have been residue, but shouldn't they have been tested? They weren't. He asked for them to be tested. The state sent them to be tested, and then they weren't tested. Because the defense said, I don't want to take the delay to get the tests done. I don't think that's correct, because the bags were sent at the same time as the other item of clothing. So why did anything get tested? Why did anything get tested if only... Yeah, I understand there were other things that didn't get tested, but the things that the state lab said they would test or that the state represented was, I think it was a sweatshirt. Yes. A sweatshirt and the bags that covered the victim's hands. And then they tested the sweatshirt. They had the bags for the same amount of time. And they didn't test the bags, but they didn't test the bags because they had an internal policy that the bags shouldn't be tested or it's no good, it's not useful. Well, what the hell is the lab doing making that determination when they've already been ordered to be tested? Well, that's a separate issue, Your Honor. I understand it, but it's an issue as to either the prosecution or the defense not saying anything about it. But it does not go up in its claim of ineffective assistance as regards to counsel's performance before trial in deciding to go to trial without waiting for the results. Well, opposing counsel says, well, he found this out, I don't know, a couple weeks before the trial, so he should have done something. He should have investigated, which, of course, we have no idea. Maybe he did. Well, the information regarding not testing the bags came up during the examination during trial. From my recollection, there was nothing before that point where whether or not bags would or could or should be tested was never brought up until the middle of trial in a response by the lab technicians. Was there some notification that testing had not occurred? I honestly don't recall the timing as to when the results came back or as to what any results were. All I can recall is that the defendant insisted on going to trial and not waiting for the results, and counsel simply acceded to that request, which is not an unreasonable strategy. And then we get to the other problem. I want to ask you that. You heard Justice Holder-Wright ask this a few ways, whether it's automatic ineffective assistance for counsel with counsel's training and experience to accede to the defendant's request. No, I want to go to trial. I don't want to wait for this, even if counsel might think this is important, potentially exculpatory evidence. I don't think it should be deemed automatic ineffective assistance. In spring, the United States Supreme Court said that conversations between counsel and defendant can determine what counsel should be doing. And to say that counsel is ineffective because he did exactly what his client wanted him to do is a very harsh standard, especially when we get to a situation like this where counsel on his own could reasonably determine, I don't like these test results because 99% of the time it's either going to be damaging to a client or it's not going to show anything. Well, is the fundamental premise correct, though, that this is counsel's call and not the defendant's? The general rule is that, yes, that it's counsel's decision whether or not to request a continuous act. If counsel requests a continuous, the defendant cannot complain about that delay on appeal. But to say that a counsel cannot consult with his client as to whether or not he should request the continuous is another thing entirely. We get to the second prong of strickling, is that you have to show prejudice. And you can go to prejudice before even deciding whether or not counsel is ineffective. And we don't know what the residue tests would have shown. Yes. So what if they, let's assume for the moment, we don't have any evidences, but let's assume that residue tests were conducted and they showed the gunshot residue on the clothing, the bags, whatever, associated with the victim in this case. Wouldn't that be potentially strong evidence to argue in support of his claim of self-defense? No, Your Honor. Why not? The defense testimony, the only testimony regarding a shot fired from inside the room was the defense testimony that the victim fired a shot at him through the open door, then slammed the door shut, and the defendant then proceeded to fire four shots through the open door. I thought there was a witness that said they heard gunfire coming from the room. The defendant's brother, who could not see when the shooting took place, who did not see the defendant with a gun, testified that he heard shots from inside the room before the defendant fired. How he could know shots came from in the room and he couldn't see anything, I don't know, but that's a credibility issue. It is evidence. He also testified that he never told anybody about this shot from inside the room before, that he did not want to testify, he did not want to get his brother in trouble. Yeah, but prior background for saying he's believable. He also had the fact that in a series of phone calls, the defendant was offering $7,000 to anybody to change his testimony, and especially telling his brother... Well, that's bad form, but still. Yeah, especially telling your brother to change your testimony to buck up the case. That's the defense's express language. Then you have the...  And they can better evaluate it, and how bad it is as testimony, how bad form or a lie, if you've got the testing of the facts. Or negative for gunshot residue, then there is even more basis to disbelieve this witness who hopes to get $7,000, and is also his brother. But my point is that notwithstanding the strength of the state's case and the weakness of the defendant's case, as you described it, the gunshot residue, if it existed, it does show that, would be a strong argument for the defense in corroboration of his theory, wouldn't it? It would only show that at some point in the past, the victim had handled the gun. And that could be explained to the fact finder, if it had been true. And it would not establish that he fired first, which is contrary to the testimony of... which is contrary to the brother's grand jury testimony and such statement of the police. It's contrary to every other witness that testified that the only shots fired were fired by the defendant. It's contrary to the testimony that there was never any gun inside that room. Of course, there were people inside the room that were getting rid of things. Were they getting rid of drugs? Were they getting rid of guns? They got rid of drugs, but somebody looked for a gun, right? Yeah, but she also testified that she looked for a gun because she was afraid of a gun being found, but that there was never any gun there, even though the victim was known to always carry a gun. So I submit that the defendant's claim, as raised in this brief, in effect was consistent because counsel abandoned the defendant because of his concerns for eviction. He's simply not established by discretion. It shows that counsel made a reasonable decision based upon the defendant's request to proceed to trial without the test results. Whether some other attorney might have handled it differently is not the standard. The standard is, did it fall below an objective standard of reasonableness? And I submit that it was objectively reasonable to try to get this case done before the election as the defendant wanted done and to go without the test results for fear of what those test results are going to show. So I think that there is no objective standard of reasonableness that's been violated and that the only claim of prejudice is based on pure speculation. So I submit that this court should affirm the defendant's conviction or alternatively refuse to consider this and say, okay, let's send it back for a post-eviction hearing where we can have a more fuller determination of, okay, exactly what was the conversation between... Well, that's not really our determination. That's the determination for the defendant? Yeah. If we leave it open. I don't know if he'll file a post-eviction petition. That's speculation. Yeah. I'm just saying counsel has said that this court should or could send it back for a post-eviction. I'm just saying that that would indeed be an option for this court, but I submit that on this record Mr. Hassinger's representation was not ineffective. Thank you, counsel. Amy Rebuttal? Could you start by clearing up this issue about when Mr. Hassinger knew that the bags had not been tested? Yes, there is. I could not find the citation as I was looking through my briefs, but there is a report in the record, the Commonwealth record, that was issued on September 1st that indicates what was not tested. It doesn't say why, but it does say when. Do we know when that report was received? Well, yes, because I think it's in volume 36, page 538. I believe this is the point at which Mr. Hassinger says on the record that he had received that report. And so this is what I was able to do while looking at your briefs and half-listening. Thank you. But I believe that page 538 in volume 63 will say that it was because he actually didn't necessarily indicate when he got the report. But that was my understanding based on his representation to the court. Another factual issue that I'd like to clear up is regarding prejudice. There was more evidence suggesting that a gunshot came from the bedroom. As discussed in my opening argument, Julian Mabon, who ultimately testified against Chapman, told the detective immediately that he heard gunshots coming from the second bedroom. This is from his initial... I think he actually only did what he was elected to do. He was called in as a witness. But this is an immediate post-shooting impression that he heard the gunshots coming from the bedroom. And also, Amy Cornwall was saying that there had to have been a gun there. And a person who's not accounted for is Kiyoshi McGowan, who was in the bedroom with Mr. Johnson, who was shot. And so the suggestion would be that maybe Kiyoshi McGowan ran out of the room with the gun. It's unclear what happened to the gun, but this is a man who always had a gun. And Amy Cornwall was very afraid that the police would go out and find all the drugs and the gun and that she was responsible for all of this. And so there was definitely evidence that there was a man besides Mr. Chapman's own brother, who was possibly the only sober person there, who proved that there was shooting coming from the bedroom. And then as for... I think what's getting lost here is that the assistant state's attorney in this case said that she was afraid that Mr. Mason was ineffective. This is something that I've never seen in my 13 years of practicing as a felon defender. I'm very concerned about the representation. I'm concerned about you going to trial without knowing what all the evidence is. This is not her responsibility, and as we've seen, they were able to prove her guilty beyond a reasonable doubt without the gunshot residue testing. The state has no obligation to provide gunshot residue testing. This was all on defense counsel. And the reason those two items were being tested was really due to the great work of the state's attorney here, who was really going out of her way, saying, I'm going to call the lab, I'm going to find out... Well, the motion for testing had been granted, right? Yeah, the motion for testing. But she put a rough order on it. She said, I want you to have evidence when you go to trial because I don't want to see what's happening here, which is, in effect, this is a proposal claim. She saw the future, and the future's happening now. This is what she was afraid of. And because the record is not fully developed, and even if it had been negative, then counsel could have pivoted and made a different kind of argument rather than putting all of the evidence in this reasonable self-defense statute, which is a tough argument to make without any kind of fiscal evidence. And so for all of the... One more thing, too, is that, yes, that's how the defendant did want to move forward, but this time schedule was set up completely by counsel. This wasn't that defendant wanted to get the work done because he wanted to get out of your home in time for his daughter's birthday party. This was all based on what counsel wanted. And the defendant was agreeing to it, but based on counsel's needs, not the defendant's needs. So for all of these reasons, we would ask for a new trial, or we could agree with the state's attorney that that would be better off. But a new trial is obviously our first request. Thank you very much. Thank you, counsel. We'll take this matter under advisement and be in recess until the next case.